Filed 4/8/21 Certified for Publication 5/7/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CALIFORNIA COASTKEEPER ALLIANCE et al., | C088922 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201780002736) |
| v. | |
| STATE LANDS COMMISSION, | |
| Defendant and Respondent. | |
| POSEIDON RESOURCES (SURFSIDE) LLC, | |
| Real Party in Interest and Respondent. | |

For a number of years, real party in interest Poseidon Resources (Surfside) LLC (Poseidon) has planned to establish a desalination plant at a site in Huntington Beach. In 2010, nonparty City of Huntington Beach (Huntington Beach), serving as lead agency performing environmental review of the proposed project pursuant to the California

1

Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), certified a subsequent environmental impact report (the 2010 subsequent EIR).[1]  However, the project did not move forward.  Following changes in circumstances including significant regulatory changes, Poseidon proposed modifications to the project, which it addressed in a proposed lease modification with defendant California's State Lands Commission (Lands Commission).  The Lands Commission determined that it needed to prepare a supplemental EIR to supplement Huntington Beach's 2010 subsequent EIR.  In 2017, the Lands Commission certified its final supplemental EIR.  Plaintiffs filed a petition for a writ of mandate asserting, among other things, that the Lands Commission failed to comply with the requirements of CEQA.  The trial court denied the petition.

The parties sharply dispute the framing of the issues presented on appeal and whether the applicable standard of review is de novo review or review for substantial evidence.  Plaintiffs assert the Lands Commission prejudicially abused its discretion by (1) failing to assume the role of CEQA lead agency and perform the attendant obligations, and (2) unlawfully piecemealing/segmenting its environmental review in several respects, matters addressed to whether the Lands Commission failed to proceed in a manner authorized by CEQA, subject to de novo review.  The Lands Commission and Poseidon assert that the true issues on appeal are whether the Lands Commission properly proceeded with supplemental review and the results of that review, factual matters subject to substantial evidence review.  Both standards of review will be implicated here.

We conclude that the Lands Commission properly elected to prepare a supplemental EIR, did not err in refusing to assume lead agency status, and did not unlawfully piecemeal or segment environmental review.

_____

[1]  Further undesignated statutory references are to the Public Resources Code.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Project Site and Lease Amendment

The subject site consists of approximately 11.78 acres including tide and submerged lands in the Pacific Ocean offshore of Huntington Beach. In 1957, the Lands Commission[2] authorized a 49-year lease to Southern California Edison for the construction of pipelines for a "once-through" cooling system.[3] In 1998, the Lands Commission approved the assignment of the lease from Southern California Edison to AES Huntington Beach, LLC (AES). The Lands Commission subsequently authorized the lease with AES to span a 20-year term, expiring on August 7, 2026.

### Project Background

Poseidon has been seeking to establish a desalination plant on the subject site since 1999. The purpose of the proposed project is to provide Orange County with a "long-term, reliable, high-quality, and local source of potable water." "Project implementation would create a local drought-proof supply of domestic water and could reduce Orange County's dependence on imported water, consistent with the goal of integrated water resource management."

---

[2] The Lands Commission "has exclusive jurisdiction over all ungranted tidelands and submerged lands owned by the State, and of the beds of navigable rivers, streams, lakes, bays, estuaries, inlets, and straits, including tidelands and submerged lands or any interest therein, whether within or beyond the boundaries of the State as established by law . . . . All jurisdiction and authority remaining in the State as to tidelands and submerged lands as to which grants have been or may be made is vested in the commission. [¶] The commission shall exclusively administer and control all such lands, and may lease or otherwise dispose of such lands, as provided by law, upon such terms and for such consideration, if any, as are determined by it." (§ 6301.)

[3] The once-through cooling system draws seawater from the Pacific Ocean through an intake pipeline, circulates the seawater through the upland generating station for cooling purposes, and then discharges the seawater back into the ocean.

3

Poseidon applied to Huntington Beach to obtain land use approvals to construct and operate a desalination facility. The proposed desalination plant would have the capacity to deliver approximately 50 million gallons per day of reverse osmosis desalinated water. The desalinated water would be distributed to Huntington Beach and various cities and local water districts for use and consumption by Orange County residents and businesses.

Originally, the desalination plant was to obtain source seawater from the adjacent AES Huntington Beach Generating Station (HBGS). According to the 2010 subsequent EIR prepared by Huntington Beach as lead agency, the "source water for the proposed seawater desalination facility will be taken from the existing HBGS condenser cooling-seawater discharge pipeline system after the water has been used by HBGS for cooling. However, if in the future HBGS were to cease the use of once-through cooling, or if the HBGS were to permanently alter its cooling water system's historical operations, the proposed seawater desalination facility would intake water directly from the Pacific Ocean via the existing HBGS intake pipe. In either case, and in order to protect the marine environment, 50 [million gallons per day] of concentrated seawater would reenter the Pacific Ocean via the existing HBGS discharge pipe after blending with additional intake water to be used for dilution." Thus, according to the 2010 subsequent EIR, "[a] key advantage of the selected site is to utilize existing ocean intake/discharge lines of sufficient seawater volume to avoid the impact of constructing new ocean intake/discharge facilities."

In addition to the desalination plant itself, the project as proposed in 2010 "also consists of the construction and operations of off-site improvements, including water delivery pipeline (new pipeline and/or replacement of portions of existing pipeline) underground booster pump stations, and modifications to an existing booster pump station, all of which will be utilized by [Poseidon] to deliver desalinated seawater to Orange County retail water purveyors."

4

## 2005 EIR and 2010 Subsequent EIR

In 2005, Huntington Beach as lead agency certified an EIR. In 2006, Huntington Beach granted the project's conditional use permit and coastal development permit. However, the project was not built.

Subsequently, Poseidon submitted a modified application to Huntington Beach, and Huntington Beach evaluated co-located, stand-alone operations and onshore facility and distribution pipeline revisions. Huntington Beach, as lead agency, prepared a subsequent EIR in 2010 as a result of changed circumstances and the development of new information. Huntington Beach certified the subsequent EIR in September 2010. Thereafter, no legal challenges were made to the 2010 subsequent EIR.

Once again, however, the project did not move forward. And, again, circumstances changed, including regulatory changes.

## 2015 Desalination Amendment

In 2015, the State Water Resources Control Board amended its Water Quality Control Plan for the Ocean Waters of California (Ocean Plan).[4] The Ocean Plan addressed implementation provisions for desalination facilities (Desalination Amendment). (Cal. Code Regs., tit. 23, § 3009.) Goals of the Desalination Amendment were to "Provide a consistent statewide approach for minimizing intake and mortality of marine life, protecting water quality, and related beneficial uses of ocean waters."

The Ocean Plan required that the regional water quality control board conduct a Water Code section 13142.5, subdivision (b), analysis of all new and expanded desalination facilities.[5] In conducting this review, the regional water quality control

---

[4] The trial Court granted Poseidon's request that it take judicial notice of the Ocean Plan.

[5] Water Code section 13142.5, subdivision (b), provides: "For each new or expanded coastal powerplant or other industrial installation using seawater for cooling, heating, or

5

board "shall first analyze separately as independent considerations a range of feasible alternatives for the best available site, the best available design, the best available technology, and the best available mitigation measures to minimize intake and mortality of all forms of marine life. Then, the regional water board shall consider all four factors collectively and determine the best combination of feasible alternatives to minimize intake and mortality of all forms of marine life." Additionally, in performing that review, the Desalination Amendment required the regional water quality control board to "consult with other state agencies involved in the permitting of that facility, including, but not limited to: California Coastal Commission, [the Lands Commission], and California Department of Fish and Wildlife. The regional water board shall consider project-specific decisions made by other state agencies; however, the regional water board is not limited to project-specific requirements set forth by other agencies and may include additional requirements in a Water Code section 13142.5(b) determination."

The Desalination Amendment provided that the regional water quality control board "shall require that the owner or operator evaluate a reasonable range of nearby sites, including sites that would likely support subsurface intakes."[6]

The regional water quality control board, in consultation with the State Water Quality Control Board, "shall require subsurface intakes unless it determines that subsurface intakes are not feasible" based on specified considerations. If the regional water quality control board determines that subsurface intakes are not feasible and surface water intakes are proposed instead, the regional water quality control board must

---

industrial processing, the best available site, design, technology, and mitigation measures feasible shall be used to minimize the intake and mortality of all forms of marine life."

[6] The Ocean Plan defined "subsurface intake" as "an intake withdrawing seawater from the area beneath the ocean floor or beneath the surface of the earth inland from the ocean." Surface water intakes, by contrast, draw ocean water from the open ocean above the ocean floor.

analyze potential designs for such intakes to minimize intake and mortality. In the event that subsurface intakes are not feasible, the regional water quality control board may approve surface water intakes subject to the condition, among others, that the surface intakes are screened with a one millimeter or smaller slot size screen or an alternative method if it is even more effective in avoiding intake and mortality.

The Desalination Amendment also provided that the preferred method for minimizing intake and mortality with regard to brine discharge was to commingle brine with wastewater, matching the salinity of the receiving water.[7] "Multiport diffusers are the next best method for disposing of brine when the brine cannot be diluted by wastewater and when there are no live organisms in the discharge." (Asterisks omitted.) Multiport diffusers "are linear structures consisting of spaced ports or nozzles that are installed on submerged marine outfalls. . . . [M]ultiport diffusers discharge brine waste into an ambient receiving water body and enable rapid mixing, dispersal, and dilution of brine within a relatively small area."

**Poseidon's Proposed Changes to the Project**

In 2010, the Lands Commission approved the amendment of the lease to include Poseidon as a co-lessee.

In 2016 and again in 2017, Poseidon, by proposed Lease Modification Project, sought to amend its lease. Poseidon sought to amend to "[i]nstall four 1-millimeter wedgewire screens with a through-screen velocity of 0.5 feet per second or less on the offshore end of the seawater intake pipeline about 1,650 feet offshore to reduce entrainment and impingement to *de minimis* levels,"[8] to "[i]nstall a multiport duckbill

---

[7] Brine "is the byproduct of desalinated water having a salinity concentration greater than a desalination facility's intake source water."

[8] Impingement occurs when marine organisms are trapped against screens or other system components and die. Entrainment occurs when smaller marine organisms, such as

diffuser on the offshore end of the discharge pipeline about 1,500 feet offshore to enhance brine mixing with seawater," and to "[r]educe seawater intake volume . . . to 106.7 [million gallons per day] (approximately 30 percent less source water than the 152 [million gallons per day] volume approved by the [Lands] Commission in 2010)."

In 2017, Poseidon further amended its Lease Modification Project application to the Lands Commission, this time to include a three-port brine diffuser rather than the previously proposed brine diffuser. Poseidon also proposed to install stainless steel wedgewire screens instead of copper nickel alloy screens.

The 2016 and 2017 amendments did not include proposed changes to the project's distribution system.

### Actions to be Undertaken by Other Agencies

On October 3, 2016, the Lands Commission, the Santa Ana Regional Water Quality Control Board (Regional Water Board), and the California Coastal Commission entered into an interagency permit sequencing framework agreement. Under the agreement, the Lands Commission agreed to consider the project "in connection with the proposed amendment first at a properly noticed, public meeting." "Consistent with the requirements of [CEQA], the . . . Lands Commission shall rely on the 2010 . . . Huntington Beach certified Subsequent [EIR] as well as prepare any additional environmental analysis required by CEQA in connection with its consideration of the Poseidon Project. The CEQA environmental analysis will be sufficient to address Poseidon's proposed seawater intake and discharge technology modifications to the Project. The . . . Lands Commission will reasonably consider any comments by the Coastal Commission and the [Regional Water Board] regarding the CEQA analysis conducted by the . . . Lands Commission staff and will seek to obtain from each agency a

---

fish larvae, are taken in through the pipeline system and mechanical systems, temperature increases, or toxic stress destroy all or most of the organisms.

sufficient description of the CEQA analysis of the proposed seawater intake and discharge technology modifications to the Project that these agencies deem necessary for them to rely on the . . . Lands Commission's certified CEQA analysis."  The Regional Water Board agreed to then consider Poseidon's application for a National Pollutant Discharge Elimination System (NPDES) permit and perform a Water Code section 13142, subdivision (b), compliance determination.  The agreement further provided, "As a CEQA Responsible Agency, the Regional Board shall consult, as necessary, with the . . . Lands Commission regarding the areas of CEQA analysis it may require on Poseidon's proposed seawater intake and discharge technology modifications prior to the release by the . . . Lands Commission of the CEQA analysis for public comment, and the Regional Board agrees that, except as otherwise required by CEQA, in developing its draft Tentative Order it can rely on the 2010 . . . Huntington Beach certified Subsequent [EIR] in combination with CEQA analysis prepared and approved by the . . . Lands Commission in its evaluation of Poseidon's proposed seawater intake and discharge technology modifications for the purposes of complying with CEQA."  Finally, the Coastal Commission would consider Poseidon's coastal development permit application.

**2017 Supplemental EIR**

The Lands Commission, as responsible agency, determined that the "proposed Lease Modification Project may involve new significant environmental effects or a substantial increase in the severity of previously identified significant impacts"; that the "2010 [subsequent EIR], which was the subject of several levels of environmental review through 2010, retains 'relevance' in light of the proposed modifications . . . and continues to have 'informational value' consistent with the California Supreme Court's ruling in **Error! Bookmark not defined.***Friends of the College of San Mateo Gardens v. San Mateo Community College District* (2016) 1 Cal.5th 937 [(*San Mateo Gardens*)]"; and that only "*minor additions or changes* would be necessary to make the previous EIR adequately apply to the project in the changed circumstances."  (Italics added.)  The

9

Lands Commission therefore determined that, pursuant to California Code of Regulations, title 14, section 15163, it would prepare a supplemental EIR "to evaluate the potential significant impacts associated with the Lease Modification Project." [9]

The Lands Commission completed a draft supplemental EIR dated May 2017. A public hearing was conducted in June 2017. In October 2017, the Lands Commission issued a final supplemental EIR consisting of 2,816 pages.

The 2017 supplemental EIR stated: "The current 'project' or proposed lease amendment analyzed in this Supplemental EIR would modify the offshore components of a seawater desalination facility that . . . Huntington Beach, as CEQA lead agency, approved in September 2010. The [Lands] Commission subsequently approved an amendment to [the] lease … that granted Poseidon a vested right[10] to use existing subsea seawater intake and discharge pipelines during desalination operations at the City-approved desalination plant through August 7, 2026 [citation]; from the [Land] Commission's perspective, its 2010 action continues to authorize desalination operations on the lease premises under the terms of the lease even though [Poseidon] has not, to date, received all permits needed to operate. *The [Land] Commission's only consideration is the proposed modifications to the approved lease, not the larger desalination plant project approved in 2010. Pursuant to . . . CEQA Guidelines section 15163, subdivision (e), before the [Lands] Commission can act on the new lease amendment, the [Lands] Commission must consider the Final Subsequent EIR approved*

---

[9] Regulatory guidelines for CEQA, promulgated by the state Natural Resources Agency, appear at California Code of Regulations, title 14, section 15000 et seq. (hereafter, in text, CEQA Guidelines).

[10] The parties refer to, and disagree about the status and significance of, any ongoing vested right Poseidon has to construct the project. We reach the same conclusion as did the trial court that this discussion has no relevance to the determinations we must make here.

*by . . . Huntington Beach in 2010 …, as revised by this Supplemental EIR, and must, pursuant to . . . CEQA Guidelines section 15091, make a finding for each significant effect shown in the previous EIR as revised for the portion of the project within the [Lands] Commission's jurisdiction*."  (Italics added.)

With regard to its purpose and scope, the 2017 supplemental EIR stated:  "The purpose of this Supplemental EIR is to identify the potential significant impacts on the environment from the Lease Modification Project, to identify alternatives that would reduce the significant effects of this project, and to indicate the manner in which those significant effects could be mitigated or avoided [citation].  This Supplemental EIR is intended to provide the [Lands Commission] with information required to exercise its jurisdictional responsibilities with respect to the Lease Modification Project . . . .  *The scope of this Supplemental EIR is limited to evaluating the changes to the 2010 lease and the incremental effects of those modifications, and should be read in conjunction with the 2010 [subsequent EIR].*  The onshore facilities (which the City approved in 2010) are not included in this analysis."  (Italics added.)  That section continued:  "A fundamental consideration in identifying potential significant impacts is establishing the appropriate baseline for the Supplemental EIR analysis.  Impacts are identified by comparing changes to the environment caused by Poseidon's proposed Lease Modification Project activities with the environmental conditions associated with the offshore portions of the intake and discharge facilities analyzed in the 2010 [subsequent EIR].  Use of an appropriate baseline is also important for establishing alternatives to the proposed activities that can be analyzed in the Supplemental EIR.  The alternatives need to be capable of reducing or avoiding one or more significant impacts of the Lease Modification Project, but do not need to address impacts associated with baseline conditions.  The [Lands Commission] must identify which components of a project are known or reasonably foreseeable; if it finds that a particular impact is too speculative for evaluation, the [Lands Commission] should note its conclusion and terminate discussion of the impact."

11

In the Project Description, the supplemental EIR again stated: "This Supplemental EIR addresses only the Lease Modification Project (i.e., the proposed modifications to the approved 2010 Project that lie offshore within the [lease] footprint) which includes one operational change and two physical modifications offshore intended to address Santa Ana [Regional Water Quality Control Board] and [California Coastal Commission] policies and regulations." Again, the changes were the reduced intake of seawater, and the installation of wedgewire screens and multiport diffusers "if the Santa Ana [Regional Water Quality Control Board], pursuant to Water Code section 13142.5, subdivision (b), determines subsurface intakes are not feasible, and brine cannot be diluted by wastewater and there are no live organisms in the discharge—consistent with 2015 Ocean Plan Desalination Amendment."

The 2017 supplemental EIR incorporated by reference the 2010 final subsequent EIR prepared by Huntington Beach.

The 2017 supplemental EIR further specified, "In 2013, after certification of the 2010 [subsequent EIR], two Independent Scientific and Technical Advisory Panels (ISTAP[]) conducted a review of the feasibility of subsurface intake options for the Huntington Beach Desalination Plant. The ISTAP completed a more detailed analysis of an offshore Subsurface Infiltration Gallery, which was eliminated from further consideration as an intake alternative in the 2010 [subsequent EIR]. The ISTAP findings were considered in determining whether a Subsurface Infiltration Gallery should be evaluated in this Supplemental EIR. Ultimately, it was eliminated from consideration . . . ."

Alternatives actually evaluated in the 2017 supplemental EIR included a no-project alternative, a rotating brush-cleaned stainless steel screen alternative, copper-nickel alloy stationary wedgewire screens, and a six-port diffuser alternative. The Lands Commission concluded that the "lease Modification Project with the **Rotating Brush-Cleaned, Stainless Steel Wedgewire Screens Alternative** is the Environmentally

12

Superior Alternative." The Lease Modification Project incorporated the modification including rotating brush-cleaned stainless steel wedgewire screen manifolds with one millimeter spacing at the end of the existing seawater intake pipeline.

**Public Hearing & Statement of Findings and Overriding Considerations**

On October 19, 2017, the Lands Commission held a public hearing. Among other things, a representative of the Orange County Water District (OCWD) stated at the hearing: "At this point in time, the district does not required [*sic*] changes to the distribution system as studied in . . . Huntington Beach's 2010 supplemental [*sic*] EIR.[11] A final decision on integrating the desalinated water will come after the project has received all of its permits, and based on those results, the district concludes the project is technically and economically feasible."

In a Statement of Findings and Overriding Considerations, the Lands Commission stated: "The Commission has balanced the benefits of the Recommended Lease Modification Project against the significant and unavoidable impacts that will remain after selection of the approved project and with implementation of all feasible mitigation in the Supplemental EIR that is adopted as enforceable conditions of the Commission's approval of the lease amendment. Based on all available information, the Commission finds that the benefits of the approved Recommended Lease Modification Project outweigh the significant and unavoidable adverse environmental effects, and considers such effects acceptable. The Commission adopts and makes this Statement of Overriding Considerations with respect to the impacts identified in the Supplemental EIR and these Findings that cannot be reduced to a less-than-significant level. Each benefit set forth above or described below constitutes an overriding consideration warranting approval of the project, independent of the other benefits, despite each and every significant

---

[11] The 2010 final EIR prepared by Huntington Beach was a subsequent EIR (Cal. Code Regs., tit. 14, § 15162), not a supplemental EIR (Cal. Code Regs., tit. 14, § 15163).

13

unavoidable impact." The Lands Commission concluded: "The Commission has considered the Final Supplemental EIR and all environmental impacts described therein including those that cannot be mitigated to a less-than-significant level and those that may affect Public Trust uses of State sovereign land. The Commission has considered the[] economic, legal, social, environmental, and technological benefits of the Recommended Lease Modification Project and has balanced them against the project's significant and unavoidable adverse environmental impacts and, based upon substantial evidence in the record, has determined that the project's benefits outweigh the adverse environmental effects. Based on the foregoing and pursuant to . . . section 21081 and . . . CEQA Guidelines section 15093, the Commission finds that the remaining significant and unavoidable impacts of the Recommended Lease Modification Project are acceptable considering the project's economic, legal, social, environmental, and technical benefits. Such benefits outweigh such significant and unavoidable impacts of the Recommended Lease Modification Project and provide the substantive and legal basis for this Statement of Overriding Considerations. [¶] The Commission finds that to the extent that any impacts identified in the Final Supplemental EIR remain unmitigated, mitigation measures have been required to the extent feasible, although the impacts could not be reduced to a less-than-significant level. [¶] Based on the above discussion, the Commission finds that the benefits of the Recommended Lease Modification Project outweigh the significant and unavoidable impacts that could remain even after mitigation is applied and considers such impacts acceptable."

The Lands Commission approved the recommendation to certify the supplemental EIR.

### Petition for Writ of Mandate

Plaintiffs filed a petition for a writ of mandate asserting the Lands Commission failed to comply with the requirements of CEQA in certifying the final 2017

14

supplemental EIR and in approving the lease amendment.**12**  Plaintiffs asserted that the Lands Commission violated CEQA Guidelines, specifically CEQA Guidelines section 15052, subdivision (a), by failing to assume the role of lead agency in undertaking additional CEQA review.  They further asserted that the Lands Commission violated CEQA Guidelines sections 15162 and 15163 by purportedly "ignoring its requirement to conduct a Subsequent EIR rather than a Supplemental EIR."  Plaintiffs asserted that, in light of substantial changes proposed for the project, substantial changes to the surrounding circumstances, and new information of substantial importance, the Lands Commission should have performed a full EIR as lead agency.  According to plaintiffs, the manner in which the Lands Commission proceeded led to unlawful segmentation of the environmental review process in violation of CEQA.  They asserted that this piecemeal approach is precisely what CEQA seeks to avoid, and it undermines the public's ability to obtain a fully informed evaluation of the project.  Plaintiffs maintained that the Lands Commission's failure to satisfy its CEQA obligations constituted a prejudicial abuse of discretion.

**Trial Court's Judgment Denying Writ Petition**

The trial court denied the writ petition in its entirety.  We need not go into detail concerning the trial court's determinations.  "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's:  The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo."  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal. 4th 412, 427 (*Vineyard Area Citizens*).)

---

**12**  Plaintiffs also raised claims addressed to the Public Trust Doctrine.  Because those claims are not at issue on this appeal, we do not discuss them here.

15

## DISCUSSION

### I.  CEQA Framework and Standard of Review

Through CEQA, " 'the Legislature sought to protect the environment by the establishment of administrative procedures drafted to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions." ' [Citation.]  At the 'heart of CEQA' [citation] is the requirement that public agencies prepare an EIR for any 'project' that 'may have a significant effect on the environment.' [Citations.]  The purpose of the EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citation.]  The EIR thus works to 'inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made,' thereby protecting ' "not only the environment but also informed self-government." ' " (*San Mateo Gardens, supra*, 1 Cal.5th at p. 944.)

"To ensure that governmental agencies and the public are adequately informed about the environmental impact of public decisions, [CEQA] [citation] requires a lead agency [citation] to prepare an [EIR] before approving a new project that 'may have a significant effect on the environment.' " (*San Mateo Gardens, supra*, 1 Cal.5th at p. 943.)  " 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project.  The lead agency will decide whether an EIR or negative declaration will be required for the project and will cause the document to be prepared." (Cal. Code Regs., tit. 14, § 15367; accord, § 21067.)

" 'Responsible agency' means a public agency which proposes to carry out or approve a project, for which a lead agency is preparing or has prepared an EIR or negative declaration.  For the purposes of CEQA, the term 'responsible agency' includes all public agencies other than the lead agency which have discretionary approval power

over the project." (Cal. Code Regs., tit. 14, § 15381; accord, § 21069.) "Alternatively stated, '[r]esponsible agencies are agencies, other than the lead agency, that have some discretionary authority for carrying out or approving a project. [Citation.] Responsible agencies generally rely on the information in the CEQA document prepared by the lead agency [e.g., an EIR] and ordinarily are not allowed to prepare a separate EIR or negative declaration. [Citations.] Further, while the lead agency is responsible for considering all environmental impacts of the project before approving it, a responsible agency has a more specific charge: to consider only those aspects of a project that are subject to the responsible agency's jurisdiction.' " (*RiverWatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1201.)

We review an agency's CEQA determination for prejudicial abuse of discretion. (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 426; § 21168.5.) " '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. [Citation.] Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' " (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935 (*Banning Ranch*).)

## II. Substantial Evidence Supporting the Decision to Prepare a Supplemental EIR

### A. Parties' Contentions

The Lands Commission asserts that plaintiffs are attempting to reframe the relevant issues in order to invoke a more favorable standard of review. The Lands

Commission asserts that the issue is not whether it should have stepped into the role of lead agency or whether the environmental review was improperly piecemealed. Rather, according to the Lands Commission, the issue is whether substantial evidence supported its determination to proceed by supplemental EIR. The Lands Commission and Poseidon assert that substantial evidence supports the Land Commission's analysis of the lease modification using its supplemental EIR coupled with Huntington Beach's 2010 subsequent EIR. The Lands Commission asserts that it determined: (1) the 2010 subsequent EIR retained informational value, and (2) it was appropriate to rely on a supplemental EIR to analyze the changes to the project and approve the proposed modifications. The Lands Commission further asserts that its determinations were supported by substantial evidence, and that plaintiffs failed to show any prejudice resulting from its actions.

In order to address plaintiffs' contentions as to whether the Lands Commission was required to assume the role of lead agency, as well as to provide necessary context for a discussion of piecemealing, it is necessary to consider the various types of subsequent environmental review under CEQA and whether the Lands Commission properly proceeded via supplemental EIR instead of a subsequent EIR.

### B. CEQA Subsequent and Supplemental Review

### 1. Subsequent Review Generally and "Subsequent" EIRs

"When an [EIR] has been prepared for a project pursuant to [CEQA], no *subsequent or supplemental* [EIR] shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the [EIR]. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the [EIR]. [¶] (c) New information, which was not known and could not have been known at the time the

18

[EIR] was certified as complete, becomes available." (§ 21166, italics added; accord, **_Error! Bookmark not defined._**_San Mateo Gardens, supra_, 1 Cal.5th at p. 943.)

CEQA Guidelines section 15162, subdivision (a), applicable specifically to subsequent EIRs, provides: "When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following: [¶] (1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; [¶] (2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant, environmental effects or a substantial increase in the severity of previously identified significant effects; or [¶] (3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following: [¶] (A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration; [¶] (B) Significant effects previously examined will be substantially more severe than shown in the previous EIR; [¶] (C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or [¶] (D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."

Subdivision (c) of CEQA Guidelines section 15162 provides: "Once a project has been approved, the lead agency's role in project approval is completed, unless further discretionary approval on that project is required. Information appearing after an approval does not require reopening of that approval. If after the project is approved, any of the conditions described in subdivision (a) occurs, a subsequent EIR or negative declaration shall only be prepared by the public agency which grants the next discretionary approval for the project, if any. In this situation no other responsible agency shall grant an approval for the project until the subsequent EIR has been certified or subsequent negative declaration adopted."

Our high court examined the subsequent review process in depth in *San Mateo Gardens, supra*, 1 Cal.5th 937. The court explained: "when an agency proposes changes to a previously approved project, CEQA Guidelines section 15162 generally prohibits the agency from requiring a subsequent or supplemental EIR unless the agency determines, 'on the basis of substantial evidence in the light of the whole record,' that '[s]ubstantial changes . . . will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects.' " (*Id*. at p. 957, quoting Cal. Code Regs., tit. 14, § 15162, subd. (a).) "[T]he substantial evidence test referred to in the Guidelines does not . . . refer to substantial evidence that the project, as modified, will necessarily have significant environmental effects. It instead refers to substantial evidence that the proposed modifications will involve '[s]ubstantial changes' that 'require major revisions of the previous EIR or negative declaration due to the involvement' of new or significantly more severe environmental effects." (*San Mateo Gardens*, at p. 957, quoting Cal. Code Regs., tit. 14, § 15162, subd. (a).)

Our high court further noted the limitations in section 21166 and CEQA Guidelines section 15162 concerning the limited circumstances under which subsequent review must be prepared "are designed to balance CEQA's central purpose of promoting

20

consideration of the environmental consequences of public decisions with interests in finality and efficiency." (*San Mateo Gardens, supra*, 1 Cal.5th at p. 949.) " 'The purpose behind the requirement of a subsequent or supplemental EIR . . . is to explore environmental impacts not considered in the original environmental document . . . .  The event of a change in a project is not an occasion to revisit environmental concerns laid to rest in the original analysis.  Only changed circumstances . . . are at issue.' " (*Ibid.*) " 'In a case in which an initial EIR has been certified, section 21166 comes into play precisely because in-depth review of the project has already occurred, the time for challenging the sufficiency of the original CEQA document has long since expired, and the question before the agency is whether circumstances have changed enough to justify repeating a substantial portion of the process.' " (*San Mateo Gardens*, at p. 956.)

The *San Mateo Gardens* court further explained:  "The subsequent review provisions . . . are . . . designed to ensure that an agency that proposes changes to a previously approved project 'explore[s] environmental impacts not considered in the original environmental document.' " (*San Mateo Gardens, supra*, 1 Cal.5th at p. 951.) "This assumes that at least *some* of the environmental impacts of the modified project were considered in the original environmental document, such that the original document retains some relevance to the ongoing decisionmaking process.  A decision to proceed under CEQA's subsequent review provisions must thus necessarily rest on a determination—whether implicit or explicit—that the original environmental document retains some informational value.  If the proposed changes render the previous environmental document wholly irrelevant to the decisionmaking process, then it is only logical that the agency start from the beginning under section 21151 by conducting an initial study to determine whether the project may have substantial effects on the environment." (*San Mateo Gardens*, at p. 951.)

Thus, "under CEQA, when there is a change in plans, circumstances, or available information after a project has received initial approval, the agency's environmental

review obligations 'turn[ ] on the value of the new information to the still pending decisionmaking process.' [Citation.] If the original environmental document retains some informational value despite the proposed changes, then the agency proceeds to decide under CEQA's subsequent review provisions whether project changes will require major revisions to the original environmental document because of the involvement of new, previously unconsidered significant environmental effects." (*San Mateo Gardens, supra*, 1 Cal.5th at pp. 951-952, fns. omitted.) "[W]hether an initial environmental document remains relevant despite changed plans or circumstances—like the question whether an initial environmental document requires major revisions due to changed plans or circumstances—is a predominantly factual question. It is thus a question for the agency to answer in the first instance, drawing on its particular expertise. [Citation.] A court's task on review is then to decide whether the agency's determination is supported by substantial evidence; the court's job ' " 'is not to weigh conflicting evidence and determine who has the better argument.' " ' " (*Id.* at pp. 952-953.)

As for a reviewing court's substantial evidence review, the *San Mateo Gardens* court cautioned, "[w]e expect occasions when a court finds no substantial evidence to support an agency's decision to proceed under CEQA's subsequent review provisions will be rare, and rightly so; 'a court should tread with extraordinary care' before reversing an agency's determination, whether implicit or explicit, that its initial environmental document retains some relevance to the decisionmaking process." (*San Mateo Gardens, supra*, 1 Cal.5th at p. 953, fn. omitted.)

## 2. "Supplemental" Review Distinguished from "Subsequent" Review

CEQA Guidelines section 15163 provides, in pertinent part: "(a) The lead or responsible agency may choose to prepare a supplement to an EIR rather than a subsequent EIR if: [¶] (1) Any of the conditions described in Section 15162 would require the preparation of a subsequent EIR, and [¶] (2) Only minor additions or changes would be necessary to make the previous EIR adequately apply to the project in

22

the changed situation.  [¶]  (b) The supplement to the EIR need contain only the information necessary to make the previous EIR adequate for the project as revised." (Cal. Code Regs., tit. 14, § 15163, subds. (a), (b); see *City of Irvine v. County of Orange* (2015) 238 Cal.App.4th 526, 539 (*City of Irvine*); *City of San Jose v. Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005, 1016.)

Under CEQA Guidelines section 15163 "if there has been a substantial change, which would otherwise require a subsequent EIR under CEQA Guidelines section 15162, but '[o]nly minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation,' then the lead agency has the discretion (the key phrase is 'may choose') [citation] to prepare a supplemental EIR that 'need contain only the information necessary to make the previous EIR adequate for the project as revised.' " (*City of Irvine, supra*, 238 Cal.App.4th at p. 539.)  Thus, CEQA Guidelines section 15163 applies when "an EIR can be made adequate by additions or changes that respond to a limited set of issues" whereas a subsequent EIR is necessary "[w]hen the previous EIR must be rewritten from the ground up to make its environmental analysis adequate." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2019) § 19.5, p. 19-9.)[13] "Regardless, the supplemental EIR must still be 'given the same kind of notice and public review' as an initial draft EIR." (*City of Irvine,* at p. 539.)

### C.  Informational Value of the 2010 Subsequent EIR

"If no action or proceeding alleging that an [EIR] does not comply with the provisions of [CEQA] is commenced during the period prescribed in subdivision (c) of

---

[13]  A third type of subsequent review, an addendum pursuant to CEQA Guidelines section 15164, is appropriate where some changes or additions to a previously certified EIR "are necessary but none of the conditions described in Section 15162 calling for preparation of a subsequent EIR have occurred." (Cal. Code Regs., tit. 14, § 15164, subd. (a).)  Addenda are not at issue here.

Section 21167, the [EIR] shall be conclusively presumed to comply with the provisions of [CEQA] for purposes of its use by responsible agencies, unless the provisions of Section 21166 are applicable." (§ 21167.2.) Huntington Beach's 2010 subsequent EIR was never challenged, and thus it was conclusively presumed to comply with CEQA for purposes of its use by the Lands Commission. (§ 21167.2.)

The Lands Commission determined that Huntington Beach's "2010 subsequent EIR . . . retains 'relevance' in light of the proposed modifications to [the lease] and continues to have 'informational value' consistent with" *San Mateo Gardens, supra*, 1 Cal.5th at pages 951 and 952. Based on the changes Poseidon sought to make through the Lease Modification Project, the Lands Commission further determined that only minor additions or changes would be needed to make the 2010 subsequent EIR adequately applicable to the project in the changed circumstances. (Cal. Code Regs., tit. 14, § 15163, subds. (a)(2), (b).) Consequently, the Lands Commission determined that a supplemental EIR pursuant to CEQA Guidelines section 15163 would suffice.

The parties agree, ["no party has ever disputed that most of the certified 2010 EIR remains relevant"]; ["everyone agrees that the prior 2010 EIR prepared by . . . Huntington Beach retains substantial informational value . . . ."] as do we, that the 2010 subsequent EIR retained "some informational value." (*San Mateo Gardens, supra*, 1 Cal.5th at pp. 951, 952.) Accordingly, the Lands Commission properly "proceed[ed] to decide under CEQA's subsequent review provisions whether project changes will require major revisions to the original environmental document because of the involvement of new, previously unconsidered significant environmental effects." (*Id*. at p. 952, fn. omitted.)

Having determined substantial evidence supports the decision to proceed under CEQA's subsequent review provisions, "the next—and critical—step is to determine whether the agency has properly determined *how* to comply with its obligations under those provisions." (*San Mateo Gardens, supra*, 1 Cal.5th at p. 953.)

24

## D. The Decision to Prepare a Supplemental EIR

CEQA Guidelines section 15163's "may choose" language provides discretion to choose between proceeding by way of supplemental EIR instead of subsequent EIR, and that choice is to be evaluated under a reasonableness standard. (*City of Irvine, supra*, 238 Cal.App.4th at pp. 539-540.) The question of whether the Lands Commission acted reasonably in electing to proceed by way of a supplemental EIR is a fact-based inquiry into whether its determination was supported by substantial evidence. It does not present a question as to whether the Lands Commission failed to proceed in the manner CEQA provides. (See generally *Banning Ranch, supra*, 2 Cal.5th at p. 935 [an "agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence"].)

" '[S]ubstantial evidence' is defined by the CEQA Guidelines to mean 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' " (*Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 282 (*Nelson*), quoting Cal. Code Regs., tit. 14, § 15384, subd. (a).) "Substantial evidence includes 'facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts,' but does not include '[a]rgument, speculation, unsubstantiated opinion or narrative, [or] evidence which is clearly erroneous or inaccurate.' " (*Nelson*, at p. 282, quoting Cal. Code Regs., tit. 14, § 15384, subds. (b), (a).)

The contemplated changes to the project, from the 2010 iteration to the 2017 version, represented by the Lease Modification Project, were: (1) the installation of one-millimeter stainless steel wedgewire screens, (2) the installation of three-port diffusers to diffuse the brine as it reentered the ocean and mixed with seawater, and (3) a reduction in the seawater intake volume from 152 million gallons per day to 106.7 million gallons per day. These changes were responsive to provisions of the Desalination Amendment.

25

We conclude that substantial evidence supports the Land Commission's determination that the foregoing changes, considered in the context of the project as a whole, would necessitate "[o]nly minor additions or changes . . . to make the previous EIR adequately apply to the project in the changed situation." (Cal. Code Regs., tit. 14, § 15163, subd. (a)(2).) Accordingly, we conclude that the Lands Commission did not prejudicially abuse its discretion in electing to proceed via supplemental EIR pursuant to CEQA Guidelines section 15163 as opposed to the more comprehensive subsequent EIR pursuant to CEQA Guidelines section 15162.

In fact, plaintiffs do not argue that it was a prejudicial abuse of discretion to proceed by supplemental EIR pursuant to CEQA Guidelines section 15163 instead of subsequent EIR pursuant to CEQA Guidelines section 15162, although they do seem to largely disregard any distinction between the two, as we discuss *post*. Rather, plaintiffs' argument is that this election did not relieve the Lands Commission of its responsibility to assume the role of lead agency.[14]

### III. Assumption of Lead Agency Status

Plaintiffs assert that the Lands Commission erred in refusing to assume the role of lead agency and perform the attendant obligations. Huntington Beach completed its

---

[14] Poseidon repeatedly asserts that plaintiffs' failure to set out substantial evidence supporting the Lands Commission's determinations forfeits any substantial evidence arguments and that such failure is fatal to plaintiffs' appeal. The Lands Commission echoes this contention. " ' "As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." ' " (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 632 (*Citizens for Positive Growth*).) The Lands Commission also asserts that plaintiffs' failure to address the substantial evidence question is fatal to their claims. In light of the manner in which plaintiffs have couched their claims, we address the merits of their contentions.

CEQA obligations in 2010. According to plaintiffs, when the original lead agency has completed its statutory obligations, but project changes or new information require additional environmental review, the next public agency to take discretionary action on the project, here the Lands Commission, "shall" step into the role of lead agency. Plaintiffs argue that "[t]his mandatory shift in lead agency status is critical to ensuring that only a single updated EIR for the project is prepared, certified, and available for use by all other approving agencies and that the courts have a single updated EIR to review." They further assert that "the lead agency role requires the preparation of a single updated EIR that adequately addresses all necessary facets of the project as a whole." Plaintiffs assert that all requirements of CEQA Guidelines section 15052, subdivision (a), governing assumption of lead agency status, were satisfied, thus requiring the Lands Commission to step in as lead agency. Plaintiffs assert that the Lands Commission's refusal to do so was a legal error that resulted in the unlawful segmentation of the updated CEQA analysis.

CEQA Guidelines section 15052, subdivision (a)(2), provides: "Where a responsible agency is called on to grant an approval for a project subject to CEQA for which another public agency was the appropriate lead agency, the responsible agency shall assume the role of the lead agency when any of the following conditions occur: [¶] . . . [¶] (2) The lead agency prepared environmental documents for the project, but the following conditions occur: [¶] (A) A *subsequent EIR is required pursuant to Section 15162*, [¶] (B) The lead agency has granted a final approval for the project, and [¶] (C) The statute of limitations for challenging the lead agency's action under CEQA has expired." (Italics added.)

Contrary to plaintiffs' contentions, CEQA Guidelines section 15052 did not mandate that the Lands Commission assume lead agency status under the circumstances presented here. As we have concluded, substantial evidence supported the Lands Commission's election to prepare a *supplemental EIR* instead of a subsequent EIR

27

because the changes to the project would only necessitate "minor additions or changes . . . to make the previous EIR adequately apply to the project in the changed situation." (Cal. Code Regs., tit. 14, § 15163, subd. (a).)  Because, under these circumstances, the Lands Commission could properly elect to proceed via supplemental EIR and forego preparing a subsequent EIR, one of the requirements of CEQA Guidelines section 15052, subdivision (a)(2), was not satisfied:  that "[a] *subsequent EIR is required* pursuant to Section 15162."  (Cal. Code Regs., tit. 14, § 15052, subd. (a)(2)(A), italics added.)  And because this requirement was not satisfied, the obligation imposed by CEQA Guidelines section 15052, subdivision (a)(2), that a former responsible agency step in as lead agency, was inapplicable.

In their briefing, plaintiffs avoid the import of the regulatory language by paraphrasing critical segments rather than quoting it.  Plaintiffs assert, for example, that CEQA Guidelines section 15052, subdivision (a), "command[s] that the next public agency to make a discretionary decision 'shall assume the role of the Lead Agency' when (i) *additional CEQA review is necessary*, (ii) the original lead agency has issued its final approval, and (iii) the statute of limitations for the original EIR has expired."  (Italics added.)  Plaintiffs elsewhere assert that CEQA Guidelines sections 15162, subdivision (c), and 15052, subdivision (a)(2), establish that "when the original lead agency has completed its statutory duties, but project changes or new information require *additional environmental review*, the next public agency to take discretionary action on the project shall step into the role of the 'lead agency.' "  (Italics added.)  However, in these characterizations, plaintiffs omit the specific regulatory language concerning the requirement of a "subsequent EIR" (Cal. Code Regs., tit. 14, § 15052, subd. (a)(2)), a requirement we consider controlling here.  Thus, plaintiffs' assertion that "[a]ll three of the[] conditions" in CEQA Guidelines section 15052, subdivision (a)(2), are satisfied here is wrong.  If the provision requiring a responsible agency to step in as lead agency was to apply to circumstances where only a supplemental EIR was required pursuant to

28

CEQA Guidelines section 15163, CEQA Guidelines section 15052, subdivision (a)(2), would have so specified.

Curiously, plaintiffs' main argument on this point was relegated to a footnote. According to plaintiffs, "there is no dispute that the first condition listed in section 15052(a) – '[a] subsequent EIR is required pursuant to Section 15162' – is satisfied here. CEQA section 21166 identifies those circumstances that trigger the requirement for a 'subsequent or supplemental' EIR."  The footnote continued:  "*An agency's election to prepare a supplemental rather than a subsequent EIR, once the subsequent EIR requirement is triggered, does not abrogate its obligation to assume lead agency status for the whole project undersection 15052(a).*  The substitute lead agency obligation applies whenever a subsequent EIR is required, and *a subsequent EIR is always required before an agency elects to prepare a more limited supplemental EIR*, as the Lands Commission did here.  Thus, whether the next agency taking discretionary action labels its CEQA document a subsequent or supplemental EIR, it must assume lead agency status under section 15052(a) and complete a single, legally adequate analysis for the whole project."  (Italics added.)

We understand plaintiffs' footnoted argument, but conclude it is wrong.  Where the circumstances permit an agency to prepare a supplemental EIR rather than a subsequent EIR because, among other things, "[o]nly minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation," then a subsequent EIR necessarily is *not required*.  Therefore, the predicate to CEQA Guidelines section 15052 that "[a] subsequent EIR *is required* pursuant to Section 15162," is not satisfied.  (Cal. Code Regs., tit. 14, § 15052, subd. (a)(2)(A), italics added.)  We do not read these regulations to mean, in effect, that a project with a changed situation that qualifies for treatment by a supplemental EIR *also retains the quality of requiring a subsequent EIR* because CEQA Guidelines section 15163, subdivision (a)(1), conditions that subdivision's applicability to circumstances where "[a]ny of the

29

conditions described in Section 15162 would require the preparation of a subsequent EIR." In other words, we do not agree with plaintiffs that, where a supplemental EIR is appropriate pursuant to CEQA Guidelines section 15163, a subsequent EIR *is also required*. Instead, we view the option to proceed by a supplement to the EIR where the required circumstances are present as an exception to the requirement for a subsequent EIR.

Our reading of CEQA Guidelines section 15052, subdivision (a), is buttressed by statutory and regulatory language indicating a supplemental EIR may be prepared by a responsible agency. As we have noted, section 21166 provides in pertinent part: "When an [EIR] has been prepared for a project . . . , no subsequent *or supplemental* [EIR] shall be required by the lead *or by any responsible agency*" unless one of several triggering conditions occur. Thus, as the italicized language makes clear, a supplemental EIR can be prepared by a responsible agency. Consistent with the statutory language, subdivision (a) of CEQA Guidelines section 15163 expressly provides in pertinent part: "The lead *or responsible agency* may choose to prepare a supplement to an EIR rather than a subsequent EIR . . . ." (Italics added.) CEQA Guidelines section 15096(f), addressing the duties of a responsible agency, provides that a responsible agency can prepare a supplemental EIR as provided in section 15163. Thus, the statutory and regulatory language clearly contemplates that responsible agencies can prepare supplemental EIRs under the appropriate circumstances and need not assume the lead agency status to do so.

Consequently, we disagree with plaintiffs' assertion that "[a]n agency's election to prepare a supplemental rather than a subsequent EIR, once the subsequent EIR requirement is triggered, does not abrogate its obligation to assume lead agency status for the whole project under section 15052(a)." Instead, we conclude that the regulations do exactly that. Where the election to prepare a supplemental EIR is proper, we conclude that the determination to do so does indeed remove the subsequent review from the scope of the CEQA Guidelines section 15052 requirement to step in as lead agency. We read

30

CEQA Guidelines section 15052, subdivision (a)(2), to mean what it says, limiting its application to cases where, among other things, "[a] subsequent EIR is required pursuant to Section 15162." (Cal. Code Regs., tit. 14, § 15052, subd. (a)(2)(A).) That is not the case here. And we read subdivision (a) of CEQA Guidelines section 15163 allowing a responsible agency to proceed by a supplemental EIR to also mean what it says, thus, the Lands Commission did not violate CEQA by preparing the supplemental EIR without assuming lead agency status.

Plaintiffs assert that, notwithstanding its refusal to assume lead agency status, the Lands Commission nonetheless acted like a lead agency. Plaintiffs assert: "the Commission behaved like a CEQA lead agency in all other respects: It circulated a Notice of Preparation and held an initial CEQA scoping meeting [citation], issued a 2,163-page Draft EIR for public review [citation], filed a Notice of Completion for the Draft EIR with the Office of Planning and Research [citation], accepted and responded to public and other agency comments [citation], produced a 2,181-page Final EIR [citation], issued a Notice of Availability and Intent to Consider Certification of the Final EIR [citation], held a final approval hearing where it made extensive CEQA Findings, certified the Final EIR, and adopted a Statement of Overriding Considerations for the Project's significant and unavoidable impacts [citation], and filed a final Notice of Determination with the State Clearinghouse." Contrary to plaintiffs' argument, we conclude the Lands Commission acted like a responsible agency preparing a supplement to the EIR under CEQA Guidelines section 15163, subdivision (a). As a responsible agency, the Lands Commission's actions fulfilled the requirement that "the supplemental EIR . . . be 'given the same kind of notice and public review' as an initial draft EIR." (*City of Irvine, supra*, 238 Cal.App.4th at p. 539, fn. omitted, quoting Cal. Code Regs., tit. 14, § 15163, subd. (c).)

We conclude that the Lands Commission did not fail to proceed in the manner CEQA provides by declining to assume the role of lead agency.

31

## IV. Unlawful Piecemealing/Segmentation Review

### A. Asserted Improper Piecemealing

#### 1. Plaintiffs' Contentions

Plaintiffs assert that, in "cleaving off the 'Lease Modification Project' as a separate, discrete CEQA activity subject to a narrowly-drawn EIR, the Lands Commission acted contrary to decades of case law interpreting the statute and regulations." Plaintiffs invoke the rule that CEQA forbids piecemeal review of significant environmental impacts of a project, and that the EIR must consider the individual and collective effects of all activities associated with a project. Plaintiffs further assert that an agency drafting an EIR cannot defer parts of the review to other agencies. According to plaintiffs, the Lands Commission's failure to undertake EIR review beyond the limited scope actually performed, and the omission of analyses of, among other things, feasible alternatives, violated CEQA. We disagree.

#### 2. Piecemealing Defined

" 'CEQA mandates that environmental considerations [do] not become submerged by chopping a large project into many little ones, each with a potential impact on the environment, which cumulatively may have disastrous consequences. [Citation.] CEQA attempts to avoid this result by defining the term "project" broadly. [Citation.] A project under CEQA is the whole of an action which has a potential for resulting in a physical change in the environment, directly or ultimately, and includes the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies.' " (*East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 293 (*East Sacramento*).)

"The process of attempting to avoid a full environmental review by splitting a project into several smaller projects, which appear more innocuous than the total planned project, is referred to as 'piecemealing.' [Citation.] Our Supreme Court set forth the relevant standard: 'We hold that an EIR must include an analysis of the environmental

effects of future expansion or other action if: (1) *it is a reasonably foreseeable consequence* of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project.' " (*East Sacramento, supra*, 5 Cal.App.5th at p. 293, quoting *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396, italics added.)

"Improper piecemealing occurs 'when the purpose of the reviewed project is to be the first step toward future development' or 'when the reviewed project legally compels or practically presumes completion of another action.' [Citation.] By contrast, an EIR need not analyze 'specific future action that is merely contemplated or a gleam in a planner's eye. To do so would be inconsistent with the rule that mere feasibility and planning studies do not require an EIR.' " (*East Sacramento, supra*, 5 Cal.App.5th at p. 293.)

### 3. Analysis

#### a. Piecemealing

Here, the Lands Commission determined that only a supplemental EIR pursuant to CEQA Guidelines section 15163 was required, a determination supported by substantial evidence as we concluded, *ante*. "A supplement to an EIR 'need contain only the information necessary to make the previous EIR adequate for the . . . project as revised' and 'may be circulated by itself without recirculating the previous draft or final EIR.' " *Melom v. City of Madera* (2010) 183 Cal.App.4th 41, 57 (*Melom*), quoting Cal. Code Regs., tit. 14, § 15163, subds. (b) & (d); accord, *City of Irvine, supra*, 238 Cal.App.4th at p. 539.) The supplemental EIR here satisfied that requirement.

As we noted *ante*, the 2010 subsequent EIR prepared by Huntington Beach, which was never legally challenged, is conclusively presumed to comply with CEQA for purposes of its use by the Lands Commission. (§ 21167.2; accord, *Laurel Heights*

*Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1130; *Save Berkeley's Neighborhoods v. Regents of the University of California* (2020) 51 Cal.App.5th 226, 236.)  That EIR analyzed the project in its entirety as of 2010.  The 2017 supplemental EIR incorporated by reference the 2010 subsequent EIR.

Subsequent changed circumstances since the 2010 subsequent EIR included the unforeseeable enactment of the Desalination Amendment.  The resulting proposed changes to the project were:  (1) the installation of one-millimeter stainless steel wedgewire screens, (2) the installation of three-port diffusers, and (3) a reduction in the seawater intake volume from 152 million gallons per day to 106.7 million gallons per day.  The Lands Commission in its 2017 supplemental EIR was only required to analyze these changes to the project.  The purpose behind a supplemental EIR is to explore environmental impacts not considered in the original environmental document.  (*San Mateo Gardens, supra*, 1 Cal.5th at p. 949, quoting *Save Our Neighborhood v. Lishman* (2006) 140 Cal.App.4th 1288, 1296)  "The event of a change in a project is not an occasion to revisit environmental concerns laid to rest in the original analysis.  Only changed circumstances . . . are at issue.' " (*Ibid.*)  As stated in the EIR, the Lands Commission, "in its continuing role as responsible agency and consistent with . . . CEQA Guidelines section 15163, is evaluating the incremental differences between the approved 2010 Project and the proposed Lease Modification Project when evaluating whether such modifications would result in any significant environmental impacts."

The Lands Commission's 2017 supplemental EIR analyzed the potential significant environmental impacts of the three proposed changes effected through the Lease Modification Project.  It identified environmental issues analyzed in the 2010 subsequent EIR, issues analyzed in the 2017 supplemental EIR, and issues "found not to be substantially affected by the Lease Modification Project."  Issues identified as addressed in the 2017 supplemental EIR included, "Ocean Water Quality and Marine Biological Resources," "Aesthetics/Light & Glare," "Air Quality," "Cultural Resources,"

34

"Cultural Resources – Tribal," "Greenhouse Gas Emissions," "Hazards and Hazardous Materials," "Noise and Vibration," "Recreation," and "Transportation (Marine)." For each of these issues, the 2017 supplemental EIR discusses the environmental setting, the regulatory setting, and significance criteria, and then proceeds to analyze the environmental impact and mitigation related to the construction phase, operation, and the cumulative impacts. ([ocean water quality and marine biological resources], [aesthetics/light and glare], [air quality], [cultural resources], [cultural resources – tribal], [greenhouse gas emissions], [hazards and hazardous materials], [noise and vibration], [recreation], [transportation (marine)].) These discussions addressed the three changes encompassed in the Lease Modification Project at length.

We need not go into further detail of the foregoing environmental analysis here. As plaintiffs acknowledge, they have "not challenge[d] the adequacy of the actual analysis that the Lands Commission chose to include in the [supplemental] EIR." Based on our review of the administrative record, substantial evidence supports the Lands Commission's approval and certification of the 2017 supplemental EIR. (See generally *Banning Ranch, supra*, 2 Cal.5th at p. 935 [" 'In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' "]; *Vineyard Area Citizens, supra*, 40 Cal. 4th at p. 427 ["We . . . resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error . . . and whether it contains substantial evidence to support the [agency's] factual determinations"].) The Lands Commission prepared its supplemental EIR, including information " 'necessary to make the previous EIR' " prepared by Huntington Beach in 2010 " 'adequate for the . . . project as revised.' " (Cal. Code Regs., tit. 14, § 15163, subd. (b); *City of Irvine, supra*, 238 Cal.App.4th at p. 539; *Melom, supra*, 183 Cal.App.4th at p. 57.) The Lands Commission did not "attempt[] to

35

avoid a full environmental review by splitting a project into several smaller projects . . .

appear[ing] more innocuous than the total planned project . . . ." (*East Sacramento,*

*supra*, 5 Cal.App.5th at p. 293.)  Rather, the Lands Commission undertook the

procedures expressly authorized by statute (§ 21166) and the CEQA Guidelines (Cal.

Code Regs., tit. 14, § 15163) that were appropriate under the circumstances.  The impetus

for the changes was the 2015 Desalination Amendment, and the provisions thereof were

not foreseeable in 2010.  The Lands Commission did not commit improper piecemealing

or segmenting of the project.

Plaintiffs, in their reply brief, assert that "there is no such thing as a supplemental

EIR for only part of a project."  This may be a correct statement, but it is an incomplete

one.  The supplemental EIR " 'need contain only the information necessary to make the

previous EIR adequate for the . . . project as revised' . . . ." (*Melom, supra*, 183

Cal.App.4th at p. 57, quoting Cal. Code Regs., tit. 14, § 15163, subd. (b); accord, *City of

Irvine, supra*, 238 Cal.App.4th at p. 539.)  The supplemental EIR supplements the

previous EIR, and the two are considered as a comprehensive whole.

All of the cases on which plaintiffs rely for the premise that CEQA forbids

piecemeal review are inapposite.  We need not delve into the circumstances of those

cases, other than to note that none of the cases on which plaintiffs primarily rely involve

supplemental EIRs prepared pursuant to section 21166 and CEQA Guidelines section

15163.  Nor need we apply their enshrined rule:  "There is no dispute that CEQA forbids

'piecemeal' review of the significant environmental impacts of a project." (*Berkeley

Keep Jets Over the Bay Com. v. Board of Port Comrs. of the City of Oakland* (2001) 91

Cal.App.4th 1344, 1358.)  As we have concluded *ante*, piecemeal CEQA review did not

occur here.

### b.  Deferral of Environmental Analysis

Relying heavily on *Banning Ranch, supra*, 2 Cal.5th 918, plaintiffs assert that our

high court "reiterated that the agency drafting an EIR cannot defer parts of the requisite

36

environmental impacts and alternatives analysis to other agencies with discretion over those parts of the project." However, *Banning Ranch* involved a full EIR (§§ 21100, 21151) performed by a lead agency, not a supplement to an EIR performed by a responsible agency pursuant to section 21166 and CEQA Guidelines section 15163.[15]

What was required of the Lands Commission here was that it conduct sufficient environmental review so as to supplement Huntington Beach's 2010 subsequent EIR, adding information "necessary to make the previous EIR adequate for the project as revised." (Cal. Code Regs., tit. 14, § 15163, subd. (b); accord, *City of Irvine, supra*, 238 Cal.App.4th at p. 539; *Melom, supra*, 183 Cal.App.4th at p. 57.) Thus, as Poseidon asserts, the Lands Commission was "required to analyze the impacts associated with the proposed Project Enhancements designed to ensure compliance with the newly-enacted Desalination Amendment, *in combination with the previously-analyzed Project impacts*." (Fn. omitted, italics added.) We have determined *ante* the Lands Commission adequately did so. Thus, as Poseidon further asserts, the 2010 subsequent EIR prepared by Huntington Beach combined with the Lands Commission's 2017 supplemental EIR "analyze[d] the Project in its entirety, including all proposed Project enhancements." *Banning Ranch*, like the other piecemealing cases on which plaintiffs rely, is inapposite.

### c. Reevaluation of Project Alternatives

Under their piecemealing/segmentation heading, plaintiffs assert that the Lands Commission in its environmental review "declined to review the feasibility of several potential alternatives to the proposed open-ocean intake system . . . ." Indeed, they argue whether the Lands Commission's failure "to step forward as the next CEQA lead agency would have been of little practical consequence had its 'Supplemental EIR' updated the

---

[15] We discuss *Banning Ranch* in further detail in our discussion of whether the Lands Commission improperly deferred determinations to the Regional Water Board in part IV.B of the Discussion, *post*.

impacts and alternatives for the entire seawater desalination Project," but instead the Land Commission "hid behind the 'responsible agency' label to avoid preparation of a comprehensive EIR."

"Whether an EIR has omitted essential information is a procedural question subject to de novo review." (*Banning Ranch, supra*, 2 Cal.5th at p. 935.) Plaintiffs' argument that the Land Commission failed to evaluate alternatives is not supported by the record.

The 2017 supplemental EIR, discussing alternatives, stated that, "The 2010 [subsequent EIR] evaluated alternatives to the 2010 Project. The [Lands Commission] is preparing this Supplemental [EIR] to assess the changes in environmental impact resulting from Poseidon's proposed modifications to [Lands Commission lease]." Among the alternatives considered in the 2017 supplemental EIR were an intake pipeline extension and a two-port diffuser. The 2017 supplemental EIR further stated: "[t]he alternatives considered but eliminated from further consideration in the 2010 [subsequent EIR] were reconsidered as alternatives to the proposed Lease Modification Project, but were eliminated from consideration in this Supplemental EIR because they were 1) outside of the scope of this Supplemental EIR, or 2) for the same reasons as in the 2010 [subsequent EIR]." Alternatives in the former category included an alternative site, alternative ownership and operation, and alternative facility configuration. Alternatives in the latter category included a beach well intake design and subsurface infiltration gallery intake, both of which are subsurface intake designs, as well as alternative discharge location, alternative discharge design, and reduced facility size. The 2010 subsequent EIR did indeed consider and reject a "no project" alternative, alternative sites, alternative ownership and operation, alternative intake and discharge designs, alternative facility configuration, and reduced facility size. The 2017 supplemental EIR, considered in conjunction with the 2010 subsequent EIR (see generally Cal. Code Regs., tit. 14, § 15163, subd. (b); *City of Irvine, supra*, 238 Cal.App.4th at p. 539; *Melom, supra*, 183

Cal.App.4th at p. 57), analyzed alternatives to the proposed project as contemplated by CEQA Regulations section 15126.6.

Plaintiffs also assert that, in light of regulatory changes effected by the Desalination Amendment and potential changes in demand, the Lands Commission was required to *reevaluate* those alternatives considered and rejected by Huntington Beach in its 2010 subsequent EIR. They do not cite authority for this contention beyond asserting that the Lands Commission violated CEQA. Moreover, the contention is contrary to the premise that the "supplement to an EIR 'need contain only the information necessary to make the previous EIR adequate for the . . . project as revised . . . .' " (*Melom, supra*, 183 Cal.App.4th at p. 57, quoting Cal. Code Regs., tit. 14, § 15163, subd. (b); accord, *City of Irvine, supra*, 238 Cal.App.4th at p. 539.) The 2010 subsequent EIR, supplemented by the 2017 supplemental EIR, considered a number of project alternatives.

## B. Asserted Improper Deferral to the Regional Water Board

Plaintiffs assert that the Lands Commission unlawfully deferred environmental impacts review and alternatives analysis to the Regional Water Board. Plaintiffs contend this asserted fragmented presentation of project impacts and alternatives is a form of piecemealing and does not comply with CEQA. According to plaintiffs, the Lands Commission "deflected responsibility for evaluating critical environmental impacts, issues, and alternatives for the proposed intake system - the very concerns that drove adoption of the Desalination Regulations and the need for Project modifications - with the dismissive statement that '[the Regional Water Board], not the Commission, is responsible for determining feasibility of subsurface intakes and compliance with Water Code section 13142.5, subdivision (b).' " Plaintiffs assert that, like in *Banning Ranch*, the "limited marine effects analysis included in the 2017 [supplemental] EIR did not and could not replace the CEQA requirement to evaluate impacts and feasible alternatives to comply with the new Desalination Regulations, which are targeted directly at eliminating

39

or reducing the consequences of open-ocean intake." Plaintiffs rely on *Banning Ranch* for the proposition that the Lands Commission's "fragmented presentation" did not comply with CEQA, which requires "a good faith attempt to analyze project alternatives and mitigation measures in light of applicable [Desalination Amendment] requirements." (*Banning Ranch, supra*, 2 Cal.5th at p. 941.) Thus, plaintiffs assert that, to perform the required evaluation, the Lands Commission had to evaluate alternative sites, alternative sizes, and alternative technologies. Plaintiffs assert that the "2017 [supplemental] EIR did none of this analysis," and instead only evaluated alternatives relevant to the proposed minor modifications.

We have, in effect, already rejected this contention, at least in a broader sense. As stated *ante*, the Lands Commission, as a responsible agency completing a supplemental EIR pursuant to CEQA Guidelines section 15163, was not required to create a plenary, stand-alone, all-inclusive EIR. Rather, the Lands Commission was only required to supplement the 2010 subsequent EIR such that, the two considered together, provided environmental review that was "adequate for the proposed project as revised." (Cal. Code Regs., tit. 14, § 15163, subd. (b); *City of Irvine, supra*, 238 Cal.App.4th at p. 539; *Melom, supra*, 183 Cal.App.4th at p. 57.) The Lands Commission was not required to do more.

The regulatory scheme changed since Huntington Beach prepared the 2010 subsequent EIR with the implementation of the 2015 Desalination Amendment. As plaintiffs note, under the Desalination Amendment, the Regional Water Board shall require subsurface intakes unless they are not feasible.

The 2010 subsequent EIR included a comprehensive consideration of subsurface intake alternatives. The EIR considered three types of beach wells: (1) vertical intake wells, (2) slant intake wells, and (3) horizontal intake wells. However, the 2010 subsequent EIR concluded, with elaboration, that "[u]se of beach well intake systems is not viable for the site-specific conditions of this project due to the limited transmissivity

40

of the coastal aquifer near the desalination facility site and the low unit yield capacity of the vertical wells."

In addition to beach well alternatives, the 2010 subsequent EIR considered subsurface infiltration gallery intake system alternatives. This alternative consists "of man-made submerged slow sand media filtration beds located at the bottom of the ocean in the near-shore surf zone, which are connected to a series of intake wells . . . located on the shore . . . ." After a lengthy and detailed discussion of these alternatives, the 2010 subsequent EIR concluded: "based on overall impacts on the environment, the public coastal resources access/use issues associated with the construction and operation of a seabed infiltration gallery, this intake alternative would not be considered feasible for application to the proposed project."

In a summary of alternative intake systems, the 2010 subsequent EIR stated: "Any one of the site-specific conditions would render subsurface intakes more impactful to the environment than the project because it would result in either irreversible damage to the Talbert Marsh, Brookhurst Marsh, and the Magnolia Marsh and negate years of restoration measures, result in a number of negative environmental impacts and human health risks, including the following: (1) detrimental environmental impact of intake well operations on the adjacent Talbert Marsh, Brookhurst Marsh, and the Magnolia Marsh due to dewatering; (2) poor water quality of the Talbert Aquifer in terms of ammonia, bacterial contamination and lack of oxygen; (3) interception of contaminated groundwater from nearby Ascon Landfill, which may introduce carcinogenic Hydrocarbons in the Source water supply of the desalination facility; (4) interception of injection water from Talbert Barrier by the intake and impairment of the function of this barrier to protect against seawater intrusion; (5) subsidence of public roads and structures due to drawdown of the groundwater table; and (6) impairment if [*sic*] the aesthetic value of the coastal shore by the obtrusive aboveground intake structures. [¶] None of these potential environmental impacts are associated with the use of the cooling water system

41

from the existing HBGS as source water for the project. The proposed intake system would not physically alter the HBGS intake or discharge system, and it would provide a more than adequate supply of source water and dilution water. None of the proposed alternative intake systems would be an acceptable substitute to the proposed use of the existing HBGS cooling water system as the supplier of source water for the Seawater Desalination Project at Huntington Beach."

The 2017 supplemental EIR noted the beach well intake and subsurface infiltration gallery intake alternatives were considered and eliminated in the 2010 subsequent EIR. It stated the rationale for elimination, and further stated that the rationale from 2010 was "also applicable to this Supplemental EIR." (Bold omitted.) With regard to the beach well intake, the reasons for elimination included "[g]reater impacts to benthic and marsh habitat, public access, aesthetics, geology and soils, hazards, and product water quality." With regard to subsurface infiltration gallery intake alternative, the reasons for elimination included, "[g]reater impacts to benthic habitat, public access, traffic and transportation, greenhouse gas (GHG) emissions and waste disposal than the proposed Project." (Fn. omitted.)

The 2017 supplemental EIR further noted the ISTAP consideration of subsurface intake options, discussed *ante*, and the fact that these options were eliminated from consideration in the 2017 supplemental EIR. After a lengthy discussion of the ISTAP subsurface alternatives, the 2017 supplemental EIR stated: "The second ISTAP concluded that both construction methods are feasible for constructing the [subsurface infiltration gallery]. The [subsurface infiltration gallery] options were found not to be economically viable at the Huntington Beach location within a reasonable timeframe, due to high capital costs."

At another point, the 2017 supplemental EIR stated that the Lands Commission "considered information from the 2010 [subsequent EIR], 2014-15 ISTAP Reports, and

2015 SED in evaluating alternatives to the Lease Modification Project."[16]  According to the 2017 supplemental EIR, the "2010 [subsequent EIR] found that subsurface intakes were infeasible or more impactful to the environment than the HB Desalination Plant as proposed."  The 2017 supplemental EIR stated that, as "part of the CEQA process, the Commission independently reviewed and analyzed these differencing opinions and concluded that the ISTAP Reports are an appropriate body of expert opinions and information that may be used in the supplemental EIR."

Contrary to plaintiffs' contention, the Lands Commission did not improperly defer consideration of alternatives, including subsurface intake alternatives, to the Regional Water Board.  As documented here, the 2010 subsequent EIR, supplemented by the 2017 supplemental EIR, considered subsurface intake alternatives and found them infeasible.

Further, Water Code section 13142.5, subdivision (b), provides:  "For each new or expanded coastal powerplant or other industrial installation using seawater for cooling, heating, or industrial processing, the best available site, design, technology, and mitigation measures feasible shall be used to minimize the intake and mortality of all forms of marine life."  In addition to specifically addressing subsurface intake alternatives, the 2010 subsequent EIR, supplemented by the 2017 supplemental EIR, addressed alternative sites, designs, technology, mitigation measures, and a no-project alternative.

In *Banning Ranch*, on which plaintiffs rely, the CEQA issue "center[ed] on whether an EIR must identify areas that might qualify as environmentally sensitive habitat areas (ESHA) under the California Coastal Act of 1976 [citation], and account for those areas in its analysis of project alternatives and mitigation measures."  (*Banning Ranch, supra*, 2 Cal.5th at p. 924.)  The City of Newport Beach, as lead agency, in its

---

[16]  "2015 SED" is a reference to a Substitute Environmental Document prepared by the State Water Resources Control Board.

43

final EIR noted the Coastal Commission's responsibility for ESHA determinations and stated that it had taken into consideration the California Coastal Act of 1976. (*Banning Ranch*, at pp. 932-933.) However, it "disavowed any obligation to further consider ESHA." (*Id*. at p. 932.) Our high court determined that a lead agency must in its EIR identify areas that might qualify as ESHAs under the California Coastal Act of 1976 and account for those areas in its analysis of project alternatives and mitigation measures. (*Banning Ranch*, at p. 924.) The court determined that the City of Newport Beach's EIR was "inadequate because it omitted any consideration of potential ESHA on the project site, as well as ESHA that were already identified." (*Ibid.*) This is not the case here. Here, the 2010 subsequent EIR, supplemented by the 2017 supplemental EIR, considered alternatives, including subsurface intake alternatives, and eliminated them as infeasible. *Banning Ranch* is inapposite.

Plaintiffs assert that the Lands Commission was required to reevaluate all of the alternatives considered in the 2010 subsequent EIR in light of the change in the regulatory scheme. However, they cite no authority that supports this proposition. More importantly, the regulations and case law discussed extensively herein do not support this contention.

The 2017 supplemental EIR's observation that the Regional Water Board had the duty to perform a Water Code section 13142.5, subdivision (b), analysis under the Desalination Amendment, and Lands Commission members' statements consistent with that premise at the public hearing, did not signal an improper deferral to the Regional Water Board.

Plaintiffs assert that changes in demand and the need for the water that would be supplied by the project had changed since 2010. Plaintiffs cite to evidence in the administrative record that they claim supports their contention that "the demand for potable water in Orange County has fallen even as water supply grows," and that the need for a large desalination plant has been "supplant[ed]." Without delving into the extent to

which the evidence on which plaintiffs rely supports their contentions, we note they fail to discuss evidence to the contrary, some of which has been highlighted by Poseidon in its briefing. As stated *ante* (see fn. 14), failure lay to out the evidence favorable to the opposing party and show why it is lacking is normally fatal. (*Citizens for Positive Growth, supra*, 43 Cal.App.5th at p. 632.)

In any event, we note evidence in the administrative record cited by Poseidon supports the premise that there remains need for the project in order to meet Orange County's water demands. In a July 7, 2016, letter to the Executive Officer of the Regional Water Board from Robert J. Hunter, General Manager of the Municipal Water District of Orange County, Hunter stated that, under normal conditions, and without the development of new supplies, water demand was expected to increase to 515,425 acre feet by 2040 while Orange County would still be relying on imported water for more than 200,000 acre feet per year. This assumed both the continued investment in water use efficiency and the expansion to 130,000 acre feet per year of OCWD's Groundwater Replenishment System. Hunter identified the project at issue here as "one of a number of projects that could help meet future projected demands as well as reduce the County's demand on imported water." Hunter also emphasized that an Orange County Water Reliability Study found that, without any new supply projects, "Orange County would have shortages in 8 of 10 years. . . . [A]dditional water supply projects . . . are needed for Orange County to be fully reliable out to the year 2040. [¶] In this regard, the proposed 50 MGD Huntington Beach Desalination Project appears to comply with Chapter III.M.2b.(2) of the Desalination Amendment."[17]

---

[17] That provision of the Ocean Plan/Desalination Amendment requires consideration of "whether the identified need for desalinated water is consistent with an applicable adopted urban water management plan prepared in accordance with Water Code section 10631, or if no urban water management plan is available, other water planning

At the October 19, 2017, public meeting of the Lands Commission, Dennis Bilodeau of the OCWD addressed current and future projected water supplies to meet demand in the OCWD service territory.  Bilodeau stated that "the facility's 56,000 acre foot per year capacity is the single largest source of new local drinking water supply available to the county."  Bilodeau noted the scope and importance of the OCWD's groundwater replenishment system, and that an expansion of that system had been approved.  He then stated, "[d]esalinization provides the district with a high quality, locally controlled, and drought-proof source that reduces the demand on imported water sources that are climate driven."  He also noted that, historically, OCWD had "taken more than our adjudicated rights to the Santa Ana River, and cannot be certain that water will always . . . be there for us."  He stated that the project "provides the district and Orange County with a unique opportunity to add a large quality of locally controlled, job-proof [*sic*] water to our supply portfolio."  Bilodeau on behalf of OCWD requested support of the staff recommendation.

State Controller Betty T. Yee asked, "the analysis with respect to these various water sources, did that include the expansion of the recycling effort.  And I guess what I'm looking for is have you fully considered all these alternatives before really looking at the water that would be produced by Poseidon, which obviously is going to be the most expensive water."  Bilodeau responded:  "Yes, we certainly have.  Really, the only opportunity we have beside Poseidon is the expansion of the groundwater replenishment system.  And we are all in on that.  Our board has already voted to go forward with that expansion.  It's in design right now.  And now, we're going through the process of the financing component.  [¶]  Poseidon would be yet another source beyond that.  And it would offset imported water sources and also contend with -- the Santa Ana River, the

---

documents such as a county general plan or integrated regional water management plan." (Asterisk omitted.)

46

base flow of it, continues to decline because of drought, and also our friends in the Inland Empire they are now recycling. And so the Santa Ana river during the summer it's not snowmelt, that's discharge from sewage treatment plants that's highly cleaned up. And then we take that water put it through wetlands actually, and then we put it into our groundwater basin. [¶] But that base flow continues to decline. And that's something that's somewhat alarming to us. So we need to continue to look for and develop new water sources to offset that." Bilodeau expressed the opinion that water produced by Poseidon would not be more water than is needed.

Additionally, plaintiffs rely on a Municipal Water District of Orange County presentation slide from February 6, 2017, which stated that Poseidon's yield of 56,000 acre feet per year would supply "more water than needed in most every year." However, as Poseidon notes, in a letter dated June 13, 2017, Hunter, the General Manager of the Municipal Water District of Orange County, stated that there was a need for additional water supply documented in the adopted Urban Water Management Plan. The Poseidon project was one option to meet that need. Hunter stated that the most comprehensive, accurate, and current analysis of Orange County water demand and supply projections was the Orange County Reliability Study. He stated that the study detailed the "probable shortfall or gap between water demand and supply through the year 2040 under various assumptions."

The Lands Commission's 2017 final supplemental EIR reflected the foregoing. It stated: "[T]he 2015 update of the OCWD's Groundwater Management Plan identifies new potable water produced at the HB Desalination Plant as a planned future water supply [citation] given a local and regional need based on limited imported water supplies, declining Santa Ana River flows, and increased demand for water. Similar information is provided in the City of Huntington Beach 2015 Urban Water Management Plan (June 2016), which states 'OCWD's current Long-Term Facilities Plan . . . identifies the [HB Desalination Plant] as a priority project and . . . the single largest source of new,

47

local drinking water available to the region' [citation]. The HB Desalination Plant water supply is also identified in the Municipal Water District of Orange County (MWDOC) Urban Water Management Plan 2015 Update and Orange County Water Reliability Study, and the MWDOC has recently stated that the HB Desalination Plant Project is 'part of our [water management plan] to reduce our demand for imported water, thereby strengthening our reliability and helping meet our goal of diversifying our water supply portfolio.' "

Substantial evidence in the record supported the Lands Commission's conclusion that there remained a need for the project to add to Orange County's water supply. (See generally *Nelson, supra*, 190 Cal.App.4th at p. 282 [defining substantial evidence in the CEQA context]; § 15384, subd. (a).) While there may also be evidence supporting plaintiffs' position, our "job ' " 'is not to weigh conflicting evidence and determine who has the better argument.' " ' " (*San Mateo Gardens, supra*, 1 Cal.5th at pp. 952-953.) " 'In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable". . . .' " (*Banning Ranch, supra*, 2 Cal.5th at p. 935.)

## C. Refusal to Consider Assertedly Reasonably Foreseeable Future Project Changes

Plaintiffs assert that the Lands Commission improperly refused to consider reasonably foreseeable project changes, specifically related to the new water distribution option OCWD was actively considering which included the construction of injection wells and pipelines. Plaintiffs contend this reasonably foreseeable change was an integral part of the project that must be considered in the supplemental EIR and it was unlawful project segmentation for the Lands Commission not to consider it.

Among other things, plaintiffs rely on a July 6, 2016, OCWD "Agenda Item Submittal" submitted to the OCWD Board of Directors. The subject of the memorandum and accompanying presentation was distribution options for the Poseidon desalination plant. The memo stated that staff presented eight options to the Board, five of which

48

were removed from further consideration. The Board instructed staff to further explore one of the options, Option 6, which was actually the combination of other options. Plaintiffs characterize this option as "quite probable," although they do not offer grounds specifically supporting this characterization.

Moreover, as we have noted, at the Lands Commission public hearing on October 19, 2017, a representative of OCWD stated that at that time, OCWD did not require changes to the distribution system studied in the 2010 supplemental EIR. This was some 15 months after the July 6, 2016, OCWD Agenda Item Submittal.

Poseidon points out that OCWD has not in fact proposed a new distribution option other than the system analyzed in the 2010 subsequent EIR. Poseidon further asserts that it had not proposed a new distribution plan. Poseidon relies on the Lands Commission's and OCWD's "repeated confirmation that 'potential modifications contemplated to distribute desalinated water by local or regional water agencies *is speculative at this time*.' "

The 2010 subsequent EIR extensively addressed the Orange County water distribution system. Plaintiffs do not contend otherwise.

In a section addressing comments about alleged changed circumstances, the Lands Commission's final 2017 supplemental EIR, where it addressed potential changes in the distribution system, stated: "Other than Poseidon's application to implement the Lease Modification Project, neither . . . Huntington Beach nor OCWD nor other entity [*sic*] to date has submitted detailed proposed physical changes to the 2010 Project, including to the Project's potable water distribution system. . . . As noted . . . the OCWD recently stated that it 'has not reached any conclusions or made any decisions regarding how desalinated [water] could be used by the District and distributed to the local water community, so no specific conveyance and utilization option has been formally selected.' "

49

The 2017 supplemental EIR relied on a letter from the General Manager of OCWD to the Regional Water Board stating: " [']*Given the expected timeline for the [HB Desalination Plant's] permitting process, OCWD has also concluded that it would not be prudent to begin an extensive environmental analysis related to use of the desalinated water in OCWD's operations and facilities, along with distributing the water to other agencies, prior to the approval of the permits for the [Huntington Beach Desalination Plant.] Decisions by the Regional Board and the other permitting agencies may result in new or different information that could increase the cost of the desalinated water and/or modify OCWD's plans for using and distributing the water.*['] "

Based on this information, the 2017 supplemental EIR further stated: "potential changes in the distribution of desalinated water onshore by local or regional water agencies are speculative at this time and not germane to the offshore Lease Modification Project before the Commission. CEQA does not require analysis of speculative impacts, and the Commission need not prepare a subsequent EIR to address environmental impacts of future actions that are uncertain, such as an onshore desalinated water distribution system that may or may not differ from the distribution system already evaluated in the 2010 FSEIR."

In another section, addressed to comments concerning recharge distribution components and distribution pipeline, the supplemental EIR stated: "If OCWD proposes to construct and operate a distribution system different from the one analyzed in the 2010 [subsequent EIR], or Recharge Distribution Components, OCWD would compete [*sic*] environmental review of these systems. This is consistent with the Supplemental EIR's statement . . . : 'Future CEQA analysis may be needed to construct an onshore desalinated drinking water distribution system, for example if a proposed system differs from the distribution system previously evaluated.' "

In its summary of other agency roles addressed to Huntington Beach and OCWD, the 2017 supplemental EIR noted: "In its 2010 [subsequent EIR], the City analyzed the

distribution of desalinated water, including various options and volumes, into the local and regional potable water system.  In 2015, the OCWD Board approved a non-binding agreement (term sheet) with terms and conditions by which OCWD and Poseidon could negotiate contracts for the purchase of desalinated water  . . . .  After initially proposing to prepare an EIR for a potable water distribution or storage system, the OCWD stated that it would not finalize its water purchase agreement with Poseidon until after the HB Desalination Plant receives all required state approvals."  Here, the 2017 supplemental EIR again relied on the passage in the letter from the General Manager of OCWD to the Regional Water Board, quoted in italics *ante*.  It then stated:  "Based on this information, potential modifications contemplated to distribute desalinated water by local or regional water agencies is speculative at this time and not germane to the Lease Modification Project.  Future CEQA analysis may be needed to construct an onshore desalinated drinking water distribution system, for example if a proposed system differs from the distribution system previously evaluated in the 2010 [subsequent EIR]."

Additionally, as stated *ante*, at the October 19, 2017, public hearing, a representative of OCWD stated:  "At this point in time, the district does not required [*sic*] changes to the distribution system as studied in . . . Huntington Beach's 2010 supplemental [*sic*] EIR.  A final decision on integrating the desalinated water will come after the project has received all of its permits, and based on those results, the district concludes the project is technically and economically feasible."

"CEQA analysis is not required, and instead may be postponed to 'a later planning stage [for] the evaluation of those project details that are not reasonably foreseeable when the agency first approves the project.' "  (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1058 (*Treasure Island*), quoting *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 139; see Cal. Code Regs., tit. 14, § 15145 ["If, after thorough investigation, a lead agency finds that a

51

particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact"].)

Based on the record, whether OCWD or another body may elect to employ a different water distribution system than what was reviewed in the 2010 subsequent EIR is speculative and not reasonably foreseeable. (See generally *Treasure Island, supra*, 227 Cal.App.4th at p. 1058.) While the OCWD Board of Directors was presented with a number of distribution options to consider in July 2016 and directed staff to further explore one of those options, all of the subsequent discussions of distribution in 2017 set forth *ante* establish that OCWD did not require changes to the distribution system analyzed by Huntington Beach in 2010. Neither Poseidon nor OCWD submitted proposed changes. As of 2017, OCWD affirmatively represented that it had no intention of conducting further analysis of distribution options at that time. There is no way to know the particulars of any new distribution system to evaluate attendant environmental impacts, let alone that one particular option is reasonably foreseeable. "[W]here 'an EIR cannot provide meaningful information about a speculative future project, deferral of an environmental assessment does not violate CEQA.' " (*Id*. at pp. 1058-1059, quoting *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 373.) That is the situation here.

* * * * *

52

# DISPOSITION[18]

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/s/
MURRAY, J.

We concur:


/s/
RAYE, P. J.


/s/
HULL, J.

---

**18**  Plaintiffs filed a motion requesting that we take judicial notice of an information request from Hope Smyth, Executive Officer of the Regional Water Board, seeking additional information in connection with that body's NPDES order and Water Code section 13142.5, subdivision (b), determination.  Ruling on the request was deferred pending calendaring and assignment of the panel.  We deny plaintiffs' request for judicial notice on the ground that the post-judgment matter addressed in the information request is unnecessary to our decision.  (*City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 594, fn. 13 [denying requests for judicial notice " 'because the proffered material is unnecessary to our decision' "]; accord, *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [matter to be judicially noticed must be relevant to a material issue].)

CERTIFIED FOR PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CALIFORNIA COASTKEEPER ALLIANCE et al., | C088922 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201780002736) |
| v. | |
| STATE LANDS COMMISSION, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Respondent. | |
| POSEIDON RESOURCES (SURFSIDE) LLC, | [NO CHANGE IN JUDGMENT] |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Richard K. Sueyoshi, Judge. Affirmed.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Part IV of the Discussion.

1

Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Crown Quandrangle, Deborah A. Sivas, Alicia E. Thesing, Matthew J. Sanders, Amanda Zerbe and Ryan Gallagher for Plaintiffs and Appellants.

Latham & Watkins, Christopher W. Garrett, Jennifer K. Roy, Winston P. Stromberg and Natalie C. Rogers for Real Party in Interest, Poseidon Resources (Surfside) LLC.

Kamala D. Harris and Xavier Becerra, Attorneys General, Daniel A. Olivas, Senior Assistant Attorney General, Jessica Tucker-Mohl, Supervising Deputy Attorney General, and Nicole U. Rinke, Deputy Attorney General for Defendant and Respondent, State Lands Commission.


THE COURT:

The opinion in the above-entitled matter filed on April 8, 2021, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


FOR THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
HULL, J.


_____/s/_____
MURRAY, J.


2